**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHITRABHANU BHATTACHARYA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:24-cv-0900 |
| | ) | Judge Nora Barry Fischer |
| THE UNIVERSITY OF PITTSBURGH | ) | |
| OF THE COMMONWEALTH | ) | Docket No. 98 |
| SYSTEM OF HIGHER EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION ON DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT WITH RESPECT TO COUNTS II THROUGH XIII**

## I. Introduction

Plaintiff, Chitrabhanu Bhattacharya, a tenured professor employed in the School of Business of Defendant, the University of Pittsburgh, was suspended without pay for a year, terminated from the H.J. Zoffer endowed Chair, and removed from his directorship of the Center for Sustainable Business ("CSB"), for "pervasive but not severe" violations of Defendant's sexual misconduct policy. In his First Amended Complaint (Docket No. 26), Plaintiff has asserted claims for deprivation of due process under 42 U.S.C. § 1983 (Count I); sex discrimination under Title IX (Count II); sex and race/national origin discrimination under Title VII (Counts IX, XI); age discrimination under the Age Discrimination in Employment Act (Count VIII); disability discrimination under the Rehabilitation Act and the Americans with Disabilities Act (Counts VI, XIII); race discrimination and retaliation under 42 U.S.C. § 1981 (Counts IV, V); hostile work

environment under Title IX and Title VII (Count III, X); retaliation under Title VII (Count XII); and breach of contract under Pennsylvania common law (Count VII).

Defendant has moved for summary judgment as to all counts. (Docket No. 98). By a Memorandum and Order dated August 14, 2026, this Court denied Defendant's motion as to Count I (concerning due process) and granted Plaintiff's Motion for Partial Summary Judgment (Docket No. 94) as to that count. (Docket Nos. 134, 135). The present Memorandum and Order will address Defendant's motion as to Counts II through XIII. The parties' positions have been briefed and argued, and the motions are ripe for decision. For the reasons set forth below, the Court will deny Defendant's motion as to breach of contract (Count VII) and will grant Defendant's motion as to all other counts.

## II. Discussion

### A. Sex Discrimination Under Title IX (Count II)

Title IX of the Education Amendments of 1972 provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance". 20 U.S.C. § 1681(a). This provision "bar[s] the imposition of university discipline when sex is a motivating factor in the decision to discipline." *Doe v. Princeton Univ.*, 30 F.4d 335, 343 (3d Cir. 2022) (quoting *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020)) ("USciences"). In *USciences*, the Third Circuit declined to "superimpose doctrinal tests" on the statute, reasoning that theories such as erroneous outcome and selective enforcement "simply describe ways in which a plaintiff might show that sex was a motivating factor". *USciences*, 961 F.3d at 209 (citation omitted). However, the court acknowledged that "parties are free to characterize their claims however they wish". *Id.*

In the present action, Plaintiff has elected to frame his Title IX discrimination claim under the "erroneous outcome" theory. (Docket No. 113 at 22-27). "To prevail on an erroneous-outcome claim, a plaintiff must 'cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and then show 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe v. St. Joseph's Univ.*, 832 Fed. App'x 770, 773 (3d Cir. 2020), quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The Court will address these two elements in turn.

**1. Articulable Doubt**

"[T]he 'pleading burden [for articulable doubt] is not heavy' and can be met by alleging 'particular procedural flaws affecting the proof'". *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018), quoting *Yusuf*, 35 F.3d at 715.[1] This Court has already held that Defendant's discipline of Plaintiff was predicated on constitutionally insufficient procedures. (Docket No. 134). Because such procedures are intended as "an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action", it follows that a material deficiency therein may give rise to an articulable doubt as to the outcome's accuracy. *See Doe v. Baum*, 903 F.3d at 585-86 (finding procedural shortcoming that "raised a plausible claim for relief under the Due Process Clause" was "sufficient to cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome").

---

[1] The Court recognizes that *Baum*, *Yusuf* and many other cases addressing the requisites of an "erroneous outcome" claim were decided at the pleading stage, in which a plaintiff's burden is lower than at the summary judgment stage. However, the Court believes that the "articulable doubt" burden is also "not heavy" at the summary judgment stage, as it is intended merely to exclude cases where "the evidence of an offense, after a fair hearing, is overwhelming". *Yusuf*, 35 F.3d at 715. The Court notes that the second element – that particular evidence suggests gender bias was a motivating factor – appears to be sufficient on its own to satisfy the test ultimately adopted in *USciences*: that "the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *USciences*, 961 F.3d at 209.

This is not to say, however, that procedural infirmity always entails articulable doubt. For example, in *Verdu v. Trustees of Princeton Univ.*, 2020 WL 1502849, *6 (D.N.J. 2020), *aff'd*, 2022 WL 4482457 (3d Cir. 2022), the district court held that "regardless of the presence of any procedural irregularities . . . [the plaintiff's] claim under an erroneous outcome theory fails for the simple reason that he has not sufficiently alleged his innocence", where the complaint admitted the "very conduct" for which the plaintiff was disciplined. Defendant attempts to align the present case with *Verdu*, asserting that Plaintiff "does not and cannot establish that he did not engage in *any of* the conduct that was being investigated", because he "admitted to *or did not rebut* many of the allegations against him – *some of which* were independently corroborated." (Docket No. 99 at 24-25) (emphasis added). As the qualifying phrases highlighted in the foregoing passage make clear, however, Plaintiff has not admitted to the "very conduct" for which he was disciplined. Rather, he admitted only to some of the conduct at issue; he denied some other charges; and (as found in Docket No. 134) he was deprived of an opportunity to respond to other charges. Because the sanctions at issue were premised on the totality of a "pervasive" pattern of less severe charges, procedural shortcomings that cast doubt on the substantial unadmitted subset of those charges suffice to cast doubt on the overall outcome. Accordingly, the Court finds that Plaintiff has satisfied the "articulable doubt" element of his erroneous outcome claim.

**2. Gender Bias**

The second element of an erroneous outcome claim is "circumstances suggesting that gender bias was a motivating factor". Plaintiff does not point to any direct evidence of gender bias, but contends that this element "may be shown if the decision was influenced by external or institutional pressure to find sexual misconduct." (Docket No. 113 at 25). Plaintiff cites two Third Circuit cases which confirm that such pressure may be relevant to a gender bias inquiry. *See*

*USciences*, 961 F.3d at 210 ("Three of our sister circuits have found that alleged university overreaction to [Department of Education] or other public pressure is relevant to alleging a plausible Title IX discrimination claim.");[2] *Princeton*, 30 F.4th at 345 (such pressure "factors into the total mix of information supporting a plausible Title IX discrimination claim"). However, in both opinions the Court of Appeals emphasized that such pressure "cannot alone support a plausible claim of Title IX sex discrimination". *Princeton*, 30 F. 4th at 345 (quoting *USciences*, 961 F.3d at 210). And indeed, *Princeton* and *USciences* both involved circumstances – *viz.*, selective investigation and enforcement – suggesting gender bias in the particular case at hand. *See Princeton*, 30 F. 4th at 344-45 (allegations of "selective handling of . . . misconduct reports" support "the inference that sex was a motivating factor in Princeton's investigation"); *USciences*, 961 F.3d at 211 (finding plausible claim of sex discrimination based upon "allegations about selective investigation and enforcement . . . combined with . . . allegations related to pressure").

Plaintiff elaborates on the factual basis of his "pressure" theory as follows:

> The investigation and disciplinary process unfolded against a backdrop of heightened institutional sensitivity to sexual misconduct allegations and internal pressure to impose severe discipline against males. After [CH] was hired into the Business School it publicly came to light via newspapers that he was found to have engaged in physical sexual misconduct. Despite review by the Investigator and the Dean, the University did not discipline him claiming that its hands were tied.[3] The female faculty "were up in arms" about the situation and over 20 of them complained to the Dean. The endowed Chairs also complained to the Dean that [CH] should have been punished for his sexual misconduct.

(Docket No. 113 at 25) (citations to record omitted). The foregoing passage accurately recounts facts in the record, with one crucial exception: a close reading of ¶¶ 178 – 195 of Plaintiff's Concise

---

[2] The "sister circuit" cases cited in *USciences* are *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019); *Baum*, 903 F.3d at 586; *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018); and *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016).

[3] The Court notes that CH's alleged sexual misconduct took place while he was employed at another university. (Docket No. 112 at ¶¶ 178, 180).

Statement of Material Facts (from which the above passage was drawn) reveals no support for the assertion that Defendant faced "internal pressure to impose severe discipline *against males*." Rather, the evidence supports an inference that Defendant faced pressure to impose severe discipline against perpetrators of sexual harassment, without regard to the perpetrators' sex. *See, e.g.*, Docket No. 112 at ¶ 192 (Dean Anderson expressing wish to "show that we really do take these matters seriously, hold perpetrators accountable, and do not tolerate harassment when it occurs").

The absence of record support for Plaintiff's assertion that the pressure upon Defendant was directed "against males" is described above as "crucial" for a reason. In *St. Joseph's*, the Court of Appeals surveyed the appellate caselaw and found "specific intent to punish male[s]" to be determinative:

> While some courts have properly pointed to internal or external pressure when evaluating gender bias, those *cases all contained indicia of specific intent to punish male students*. *See, e.g.*, [*USciences*], 961 F.3d at 210 (gender bias plausibly alleged where the school, "encouraged by federal officials, ha[d] instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women"); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 27 (2d Cir. 2019) (gender bias plausibly alleged where, among other things, the school "faced internal criticism for its assertedly inadequate response to *male* sexual misconduct on campus" (emphasis added)); . . . *Purdue*, 928 F.3d [at] 669 . . . (gender bias plausibly alleged where, among other facts, school-affiliated group shared an article titled "Alcohol isn't the cause of campus sexual assault. Men are."); . . . *Baum*, 903 F.3d [at] 586 . . . (gender bias plausibly alleged where, for example, "news media consistently highlighted the university's poor response to *female* complainants" (emphasis added)); . . . *Miami*, 882 F.3d [at] 594 . . . (gender bias plausibly alleged where school was being sued by a female student for failing to expel her alleged attacker).[4]

*St. Joseph's*, 832 Fed. App'x at 774. The court concluded that because the plaintiff "does not point to evidence of similarly slanted conduct", he has failed to meet his burden to show that the

[4] *See also Columbia*, 831 F.3d at 57 (allegations of student body and media criticism "accusing the University of not taking seriously complaints of female students alleging sexual assault by male students" made it "plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male").

university discriminated against him on the basis of sex. *Id.* at 774-75 & n.3. In so holding, the court rejected the plaintiff's argument that the school's "emphasis on combatting sexual assault [(including "encourag[ing] students to believe and support those who claimed to be victims of sexual violence")] "reflects the school's gender bias", because "these facts are gender neutral". *Id.* at 774.

Numerous other courts concur. As the Eleventh Circuit has explained,

> These allegations . . . might permit a reasonable inference that the decision to suspend [the plaintiff] was motivated by a pro-complainant, anti-respondent bias. But discrimination against respondents is not discrimination "on the basis of sex," see 20 U.S.C. § 1681(a), and "does not permit a reasonable inference of an anti-male bias" "because both men and women can be respondents".

*Doe v. Samford University*, 29 F.4th 675, 691 (11th Cir. 2022) (quoting *Doe v. Univ. of Denver*, 952 F.3d 1182, 1196–97 (10th Cir. 2020). *See also, e.g.*, *Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016) (bias in favor of sexual assault complainants "does not equate to gender bias because sexual-assault victims can be both male and female"); *Doe v. Rider Univ.*, 2020 WL 634172, *9 (D.N.J. 2020) (alleged "bias against the alleged perpetrator in favor of the victim is insufficient to show an inference of gender bias"); *Ludlow v. Northwestern Univ.*, 125 F. Supp. 3d 783, 793 (N.D. Ill. 2015) (allegation that university "needed to believe the victim" does not sustain the inference that [the university] took the genders of the victim and accused into account."; *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (bias against students accused of sexual assault is not the equivalent of bias against males, even if all of the students accused of assault were male); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) ("a bias

against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination").

In the present case, Plaintiff has not adduced evidence that any pressure on Defendant's investigator and decision-makers was directed specifically against males (*qua* males). Nor has he proffered evidence of other circumstances suggesting gender bias. The Court concludes that Plaintiff cannot meet his burden to establish an erroneous outcome claim under Title IX. Accordingly, Defendant is entitled to summary judgment with respect to Count II.

### B. Hostile Work Environment Under Title IX and Title VII (Count III, X)

In Counts III and X, Plaintiff claims that he was subjected to a hostile work environment on account of his sex, in violation of Title IX and Title VII. (Docket No. 26). As this Court stated in a previous case involving allegedly false accusations of sexual harassment against a university faculty member,

> To succeed on a hostile work environment claim, the plaintiff must establish that: 1) the employee suffered intentional discrimination because of his sex; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of *respondeat superior* liability.

*Kahan v. Slippery Rock Univ. of Pa.*, 50 F. Supp. 3d 667, 697 (W.D. Pa. 2014), *aff'd* 664 Fed. App'x 170 (3d Cir. 2016).[5] Defendant argues that Plaintiff "cannot prove any element of his hostile work environment claims". (Docket No. 99 at 27). It will suffice for the Court to address the first two elements. With respect to these, Defendant asserts that "[t]here is no evidence that [Plaintiff] suffered any action whatsoever because of his sex, let alone an action that was severe and pervasive". *Id.* The Court agrees.

[5] Subject to a minor difference not relevant to the Court's analysis, the elements of a hostile workplace claim under Title IX are the same as under Title VII. *See Kahan*, 50 F. Supp. 3d at 697-98.

As to the first element, the gravamen of Plaintiff's hostile work environment complaint is that he was "subjected to false accusations that he had engaged in sexual harassment", and that these accusations "are linked to [his] gender." (Docket No. 26 at 17, 28). As explained in Part II(A)(2) above, Plaintiff has not proffered evidence sufficient to support an inference that any aspect of Defendant's investigation and discipline of him was motivated by his sex. By the same token, Plaintiff has not produced evidence that accusations of sexual harassment (whether true or false) were leveled at him, or any other action was taken against him, because of his sex.

As to the second element,

> To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." To survive summary judgment, a plaintiff must present some evidence that the workplace was permeated with discriminatory intimidation, ridicule, or insult that was so severe or pervasive that it altered the conditions of employment and created an abusive working environment.

*Kahan*, 50 F. Supp. 3d at 697 (citations omitted). Plaintiff's evidence does not meet this standard. As far as the record reflects, Plaintiff was confronted with accusations of sexual harassment in a June 5, 2023 meeting; a July 10, 2023 charging letter; a July 27, 2023 investigative interview (and a summary of notes thereof); and a November 7, 2023 sanctions letter. (Docket No. 95 at ¶¶ 22, 24, 46, 53, 56, 106-07, 111). There is no evidence that these communications, made in the course of investigative, adjudicative and appellate proceedings, were discriminatory, or "hostile" in the sense described in *Kahan*. Even assuming that notifying an employee of charges against him can ever qualify as hostile, the Court finds that a reasonable jury could not determine that these few notifications were sufficiently "severe or pervasive" as to create an abusive work environment. Because Plaintiff is unable to establish either of the first two elements of his hostile work environment claim, Defendant is entitled to summary judgment with respect to Counts III and X.

**C. Race Discrimination and Retaliation Under 42 U.S.C. § 1981 (Counts IV, V)**

Plaintiff's First Amended Complaint purports to state claims against Defendant for race discrimination and retaliation under 42 U.S.C § 1981. Defendant points out that according to Third Circuit precedent, "no right of action exists against state actors under Section 1981." (Docket No. 99 at 28) (citing, *inter alia*, *McGovern v. City of Phila.*, 554 F.3d 114, 122 (3d Cir. 2009)). Plaintiff does not dispute this point; nor does he dispute that Defendant is a "state actor". Instead, Plaintiff suggests that at some unidentified time, he "likely will move to amend for a technical defect to aver that his Section 1981 race discrimination claim is brought pursuant to Section 1983." (Docket No. 113 at 37 n.10). However, in the four months since that suggestion (and in the more than six months since Defendant's Brief in Support of Summary Judgment plainly brought this error to Plaintiff's attention), Plaintiff has not filed any motion for leave to amend Counts IV and V.[6] In the meantime, it is clear that Plaintiff has no right of action under § 1981, and Defendant is entitled to summary judgment on Counts IV and V.

**D. Discrimination on the Basis of Sex and Race/National Origin Under Title VII, Age Under the ADEA, and Disability Under the RA and the ADA (Counts VI, VIII, IX, XI, XIII)**

Plaintiff asserts claims for discrimination on the basis of sex and race/national origin under Title VII, age under the Age Discrimination in Employment Act ("ADEA"), and disability under

---

[6] The Court notes that a request for leave to amend at this late date would face substantial hurdles due to undue prejudicial delay and futility. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to amend complaint may be denied for "undue delay, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."); *Yager v. Carey*, 910 F. Supp. 704, 732 (D.D.C. 1995), aff'd, 159 F.3d 638 (D.C. Cir. 1998) (denying leave to amend due to "additional four month delay" during which "defendants moved for summary judgment on all existing counts", so that if leave were granted "defendants would be forced to supplement their summary judgment papers"). Here, as Defendant points out, "it would be inappropriate and . . . prejudicial . . . for [Plaintiff] to be permitted to amend his complaint following the Court's disposition of the parties' respective summary judgment motions." (Docket No. 124 at 8). Moreover, such an amendment would likely be futile in view of this Court's present grant of summary judgment against plaintiff on equivalent claims under Title VII due to Plaintiff's inability to proffer evidence that Defendant disciplined him on account of his race or of his assertion of a race discrimination claim.

the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA"). (Docket No. 26 at 20-22, 26-28, 29-30, 31-33) (Counts VI, VIII, IX, XI, XIII). Absent direct evidence of discriminatory animus (which is not present here),[7] each of these claims is analyzed under the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Wilcher v. Postmaster General*, 441 Fed. App'x 879, 880 (3d Cir. 2011) (Title VII race and sex); *Burton v. Teleflex Inc.*, 707 F.3d 417, 425-26 (3d Cir. 2013) (Title VII sex and ADEA); *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 699 (W.D. Pa. 2014) (ADA); *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (RA).[8]

Under *McDonnell Douglas*, a plaintiff has the initial burden to establish a *prima facie* case of discrimination by showing that:

> (1) [he] is a member of a protected class; (2) [he] is qualified for the position; (3) [he] suffered an adverse employment action; and (4) similarly situated persons who are not members of [his] protected class were treated more favorably or that the circumstances of [the adverse action] give rise to an inference of discrimination.

*Epps v. First Energy Nuclear Operating Co.*, 2013 WL 1216858, at *17, citing *Warfield v. SEPTA*, 460 F. App'x 127, 129–30 (3d Cir. 2012). In the present case, as often occurs in discrimination actions, the first three elements are essentially undisputed: Plaintiff is protected by law from discrimination on the basis of his sex, race, national origin, age and disability status; there is "no

---

[7] "Direct evidence" of discrimination is "evidence that is 'so revealing of discriminatory animus that it is not necessary to rely on any presumption' from the plaintiff's prima facie case to shift the applicable burden of production to the defendant." *Norfolk v. GEO Grp., Inc.*, 2020 WL 1873991, at *6 (W.D. Pa. Apr. 15, 2020), quoting *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 n.4 (3d Cir. 1995).

[8] As the Third Circuit explained in *Wishkin*,

> We have stated that "the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir.1995). Accordingly, the familiar framework established in *McDonnell Douglas* . . . for Title VII cases is equally applicable to discrimination claims under the Rehabilitation Act.

*Wishkin*, 476 F.3d at 185.

dispute that [he] possessed the academic and professional qualifications for his position and appointments"; and his suspension and other sanctions constituted an adverse employment action. (Docket No. 99 at 30). Plaintiff's *prima facie* case therefore turns on the fourth element, as to which – with the exception of his claim for sex discrimination[9] – Plaintiff has proceeded under the theory[10] that similarly situated employees who were not members of his protected classes were treated more favorably.[11]

In order to establish the fourth element of a *prima facie* case under a disparate treatment theory, a plaintiff must "introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances)". *Greene v. Virgin Islands Water & Power Auth.*, 557 Fed. App'x 189, 195 (3d Cir. 2014). As Plaintiff acknowledges, to support an inference of discrimination "comparator employees must be similarly situated in all relevant respects." (Docket No. 113 at 31) (quoting

---

[9] In support of his Title VII sex discrimination claim, Plaintiff "incorporates his discussion of Erroneous Outcome" under Title IX, wherein he asserted that gender bias is inferable from evidence that his discipline "was influenced by external or institutional pressure to find sexual misconduct". (Docket No. 113 at 25, 38). As set forth in Part II(A)(2) above, the Court has found Plaintiff's evidence with respect to pressure insufficient to support an inference of gender bias. The same insufficiency entails that Plaintiff has failed to establish a *prima facie* case of sex discrimination under Title VII. The Court notes that Plaintiff cannot proceed under a disparate treatment theory to satisfy the fourth *prima facie* element of his sex discrimination case due to a complete absence of female comparators.

[10] As an alternative to his disparate treatment theory for his ADA/RA claims, Plaintiff appears to argue that Defendant discriminated against him by failing to accommodate his disability when it declined to excuse conduct allegedly resulting from the interaction of alcohol with pain medication necessitated by his injuries. (Docket No. 113 at 41). *See Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."). However, as Defendant points out, an employer is not required to accommodate a disability "by overlooking . . . past misconduct – irrespective of whether the misconduct resulted from … a disability". (Docket No. 9 at 41) (quoting *Katz v. UPMC*, 2019 WL 3843041, at *8 (W.D. Pa. 2019), *aff'd*, 835 F. App'x 664 (3d Cir. 2020)). *See also, e.g., Sever v. Henderson*, 220 Fed. App'x 159, 161-62 (3d Cir. 2007) ("the employer is not prohibited from discharging an employee for misconduct, even if that misconduct is related to his disability"). Plaintiff's failure to accommodate theory is therefore unavailing.

[11] *See* Docket No. 26 (First Amended Complaint) at ¶¶ 147, 233 ("Similarly situated colleagues of Dr. Bhattacharya who were not of Indian/South Asian race or national origin . . . were not subjected to similar adverse actions."); *id*. at ¶¶ 172, 260 (Plaintiff "was treated less favorably [than] his non-disabled colleagues."); id. at ¶ 208 ("Faculty and/or staff at the University who were significantly younger than [Plaintiff] were not subjected to similar adverse employment action.").

*Wilcher*, 441 Fed. App'x at 882). According to *Wilcher*, "[a] determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher*, 441 Fed. App'x at 882.

Plaintiff asserts that "[w]hether comparators are similarly situated is generally a question of fact for the jury." (Docket No. 113 at 33) (quoting *Abdul-Latif v. County of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014)). While the quoted language does indeed appear in *Abdul-Latif*, the very next sentence of that opinion is also instructive: "Nonetheless, summary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated." *Abdul-Latif*, 990 F. Supp. 2d at 526 (citing *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. App'x 220, 223-24 (3d Cir. 2009)). *Opstanik*, in turn, further elaborated on the requirements for a comparator to be considered similarly situated:

> While "similarly situated" does not mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). Which factors are relevant is determined by the context of each case, but often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir.2000).

*Opsatnik*, 335 Fed. App'x at 222-23. *See also McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (stating that factors listed in *Radue* are "relevant" in the "particular context" of "workplace disciplinary and/or personnel actions").

In the present case, Plaintiff has put forward five purported comparators:

First, C.H.[12] was hired as a tenured professor in Defendant's Business School on July 1, 2022. (Docket Nos. 100 at ¶ 182, 111 at ¶ 182). In January, 2023 Defendant learned from media reports that C.H. had been found responsible for "some kind of sexual misconduct violation" while employed at another university. (Docket No. 112 at ¶ 179).[13] In consequence, C.H. "voluntarily stepped down from his [endowed] chair and was asked to go to training and refrain from attending university events where alcohol is served," but he was not otherwise disciplined, as "the school and Dean believed that their hands were tied somewhat by [the] hiring process and the timing of the allegations". (Docket No. 112 at ¶¶ 185, 187).

Although C.H. and Plaintiff were both employed in the Business School, reported to the same Dean, and presumably had similar job responsibilities and standards, their cases are not comparable because they involved materially different conduct. As far as the record reflects, C.H.'s alleged misconduct took place on a single occasion,[14] in contrast to the pervasive pattern of verbal and physical conduct for which Plaintiff was sanctioned. Moreover, C.H.'s alleged conduct occurred prior to his employment with Defendant, whereas all of Plaintiff's alleged misconduct took place in the course and scope of his employment with Defendant. These differences plainly constitute "such differentiating or mitigating circumstances as would distinguish [C.H.'s and Plaintiff's] conduct or [Defendant's] treatment of them." *Opsatnik*, 335 Fed. App'x at 223.

[12] Because three of the comparators are referred to in the record solely by their initials, for consistency the Court will refer to all of the comparators by their initials in this Opinion.

[13] There have been no sexual misconduct allegations against C.H. while employed by Defendant. (Docket Nos. 100 at ¶ 184, 111 at ¶ 184).

[14] The occasion was "a gala event" where C.H. "had been drinking and dancing with undergraduate students, and the impression is that he had touched or groped in some way." (Docket No. 112 at ¶ 180).

Second and third, G.S. and O.S. are faculty employees of Defendant's Dietrich School of Arts and Sciences who were separately charged with alleged sexual misconduct in or about 2020. (Docket Nos. 100 at ¶¶ 189, 195, 204, 208; 111 at ¶¶ 189, 195, 204, 208). G.S. was disciplined for harassing an undergraduate student by "making inappropriate gender- and race-based comments and inviting her out for dinner and drinks during one specific in-office meeting." (Docket Nos. 100 at ¶ 196; 111 at ¶ 196). O.S. was disciplined for "impugning his colleague's work and pouring water on her and another woman." (Docket Nos. 100 at ¶ 212, 111 at ¶ 212).[15] G.S.'s and O.S.'s sanctions, as determined by Dean Kathleen Blee of the Dietrich School, included a no contact order and a "last chance warning", but not a suspension. (Docket Nos. 100 at ¶¶ 199-200, 214-15; 111 at ¶¶ 199-200, 214-15).[16]

G.S. and O.S. were employed in a different school from Plaintiff, with a different Dean as supervisor and disciplinary decision-maker; and (so far as the record discloses) G.S.'s and O.S.'s sanctions reflected a single occasion of misconduct toward a single complainant rather than a pervasive pattern of alleged misconduct toward multiple complainants.[17] In the Court's view,

[15] O.S. was also accused of inviting the same colleague to sit on his lap, but was found "not responsible" for that charge. (Docket Nos. 100 at ¶¶ 209, 211; 111 at ¶¶ 209, 211).

[1616] G.S.'s and O.S.'s sanctions also provided that their violations would be "taken into account during [their] next salary and performance review". (Docket No. 100 at ¶¶ 200, 215, 111 at ¶¶ 200, 215). G.S.'s sanction also included a requirement to "complete training". (Docket Nos. 100 at ¶ 200, 111 at ¶ 200). O.S.'s sanction also included suspension of faculty status and prohibition of holding a departmental position, for five years. (Docket Nos. 100 at ¶ 215, 111 at ¶ 215).

[17] In addition to the 2020 incident, Plaintiff cites reports from October 2022 and January 2023 of sex- and race-based statements and demonstrative conduct in a communications class that upset students, and a 2025 complaint about emails calling students "beautiful". (Docket No. 112 at ¶¶ 204-05). Plaintiff asserts that "[t]here is no evidence that Dr. G.S. ever was investigated let alone sanctioned for the 2023 or 2025 complaints as he remains employed by the University as demonstrated by his biography on the University's website." (Docket No. 112 at ¶ 206). However, Plaintiff, who has the burden of proof, has not proffered any evidence that G.S. was *not* investigated or sanctioned. As Defendant points out, "the fact that G.S. remains employed at the University does not at all indicate that he was never investigated or sanction[ed] for alleged 2023 and 2025 complaints (as is evident by the fact that [Plaintiff], who was investigated and sanctioned, remains employed at the University)." (Docket No. 123 at ¶ 206). Moreover, the Court observes that because the 2022-23 conduct was alleged to have occurred in the course of teaching, and the statements and demonstrative conduct appear to have concerned the subject being taught, any imposition of discipline

these differences entail that G.S. and O.S. are not appropriate comparators upon which to base an inference of discrimination.

Fourth, Assistant CSB Director C.G. was "accused of sexual harassment at the same time as Plaintiff" by one of Plaintiff's accusers, a CSB employee; and "the University failed to investigate or discipline him." (Docket No. 113 at 31). Assuming that C.G., as Assistant CSB Director, was held to the same standards as Plaintiff (the Director, who was also a tenured, chaired professor), the Court nevertheless finds that C.G. is not similarly situated to Plaintiff due to material difference in the conduct of which they were accused. An employee complained that C.G. "asked him whether he was 'sexting' someone and later [asked] about his love life"; and the same employee reported that Plaintiff "touched him on the shoulder and then 'let his hand trail down [the employee's] back' until it rested on his buttocks." (Docket Nos. 100 at ¶ 101; 111 at ¶ 101; 112 at ¶ 125). Whether or not these allegations are comparably serious in isolation, the record reveals no other complaint of sexual harassment against C.G., whereas the charge against Plaintiff was but one component of what Defendant's investigator found to be "pervasive sexual harassment based upon some 16 'behaviors/comments' comprising nine alleged incidents of unwelcome physical conduct and 10 or 11 alleged incidents of verbal behavior." (Docket No. 134 at 10). The Court concludes that C.G. is not a relevant comparator for purposes of supporting an inference of discrimination based on disparate disciplinary treatment.

In addition to his disparate treatment theory, Plaintiff asserts that C.G. – younger, Caucasian, U.S.-born - "replaced [Plaintiff] as CSB Director in 2025" and that "[t]he fact that he assumed Plaintiff's Director duties is sufficient for an inference of discrimination." (Docket No.

---

for such conduct might raise First Amendment and academic free speech issues that are not similarly raised by Plaintiff's essentially gratuitous conduct toward his subordinates.

113 at 31-32) (citing *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 267 (3d Cir. 2021)). It is true that the causation element of a *prima facie* age discrimination claim may be met by a showing that the claimant "was replaced by . . . someone else 'who was sufficiently younger so as to support an inference of a discriminatory motive.'" *Martinez*, 986 F.3d at 266 (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015)). However, *Martinez* and *Willis* contemplate "direct" replacement. *See Martinez*, 986 F.3d at 264 ("soon after" firing plaintiff, hospital hired two younger doctors, of whom one "took over at least some of [plaintiff's] job functions", and the other filled plaintiff's vacated role as orthopedic surgeon); *Willis*, 808 f.3d at 644 (noting that "[w]here the plaintiff is not directly replaced", the causation element may be satisfied by other evidence suggestive of discriminatory motive). In the present case, it is undisputed that Plaintiff was directly replaced as CSB Director by Dr. John Camillus, who served in that role for two years (from September 1, 2023 until August 31, 2025) before C.G. was promoted from his Assistant Director position.[18] (Docket Nos. 112 at ¶¶ 42-44, 46; 123 at ¶¶ 42-44, 46). Because C.G. did not directly replace Plaintiff, and was not similarly situated to Plaintiff for disparate treatment purposes, the Court concludes that Defendant's failure to discipline C.G. in 2023, and its promotion of C.G. to the CSB Director role in 2025, do not support an inference that Plaintiff's discipline was motivated by discriminatory animus.

Fifth, K.H., a surgeon[19] employed in Defendant's School of Medicine, was "found responsible for engaging in sexual harassment towards staff, residents, students, and other faculty", based upon "more than 10 acts of verbal sexual harassment" constituting "repeated vulgar and sexist conduct" that Defendant's investigator considered "more serious" than Plaintiff's conduct.

---

[18] The parties do not address Dr. Camillus's membership, *vel non*, in the protected classifications as to which Plaintiff is claiming discrimination.

[19] (Docket No. 113 at 11 n.3).

(Docket Nos. 112 at ¶¶ 207, 208; 123 at ¶ 207). "K.H.'s discipline involved only a 'formal written warning,' professional coaching sessions, and no leadership positions for two years but no suspension." (Docket Nos. 112 at ¶ 210; 123 at ¶ 207).

As with the other purported comparators, the Court must consider whether K.H. and Plaintiff "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct". *Opsatnik*, 335 Fed. App'x at 223. It appears to the Court that K.H.'s alleged conduct (unlike that of the four other proposed comparators) is at least comparable to the conduct for which Plaintiff was disciplined. Moreover, Defendant concedes that the same "CS_20 Sexual Misconduct Policy" under which Plaintiff was disciplined "applies to all members of the University community". (Docket No. 100 at ¶¶ 1, 2, 143). Consequently, a jury could find that K.H. and Plaintiff were similarly situated with respect to the "same standards" point of comparison because "they were both equally bound to follow the same code of conduct". *GEO Grp.*, 2020 WL 1873991, at *8.[20]

As to the "same supervisor" or "same decision-maker" point of comparison, Plaintiff does not contend that K.H. reported to Dean Anderson, or that his discipline was determined by Dean Anderson. In an attempt to overcome this deficiency, Plaintiff argues that K.H.'s "discipline funneled into the same decision-maker as in Plaintiff's case, Provost McCarthy." (Docket No. 113 at 32-33). However, the relevant decision-maker with respect to allegedly disparate sanctions is the Dean, not the Provost. As Plaintiff has conceded, "[i]t was up to Dean Anderson to decide [Plaintiff's] punishment." (Docket No. 95 at ¶ 97).[21] On the other hand, the Provost's "only role

[20] *But cf. Epps*, 2013 WL 1216858, at *18 ("[E]ven though [putative comparators] were all subject to the [same] workplace violence policy in their respective roles and assuming that they had each engaged in similar conduct, the differences in their positions, departments and supervisors make clear that they are not similarly situated to Epps.") (citing *Mandel v. M & Q Packing Corp.*, 706 F.3d 157, 170 (3d Cir. 2013)).

[21] *See also* May 29, 2025 Anderson Declaration (Docket No. 53-1) at ¶ 10 ("The responsibility of determining whether and, if so, to what extent, sanctions should be imposed as the result of a finding of responsibility made against a faculty

in the appeal process" was "not to adjudicate the appeal" but to "receive the Appeals Board recommendation and decide whether to agree with it." (Docket No. 95 at ¶ 145). *See also, e.g.*, Docket No. 113 at 10 ("the Provost affirmed without independent review"); *id.* at 20 (the Provost conducted a "perfunctory", "superficial" and "strictly limited non-factual review"). Crucially, Plaintiff does not contend that K.H. (or any other comparator) was treated more favorably than Plaintiff in the appeal process, as K.H.'s sanction (like Plaintiff's) was "upheld by the Appeal Board . . . and by Provost McCarthy." (Docket No. 112 at ¶ 211). Rather, the only disciplinary disparity evidenced by the record involves the determination of sanctions, as to which, again, the decision-maker was the Dean. Accordingly, here as in *Wilcher*, although K.H. may have been disciplined less harshly than Plaintiff for the same (or greater) misconduct, K.H. "is nonetheless not comparable because . . . it was at the discretion of a different supervisor"). *Wilcher*, 441 Fed. App'x at 882. *See also Opsatnik*, 335 Fed. Appx. at 223 ("Although there can be no per se rule that comparator evidence from employees with different supervisors is irrelevant," absent "evidence suggesting a link between the purported comparators and the motivations of the [plaintiff's] decision-makers", "such comparators do not cast doubt" on the employer's reasons for disciplining the plaintiff.).[22]

In sum, each of Plaintiff's purported comparators either reported to a different supervisor, or was charged with isolated rather than pervasive misconduct, or both. Accordingly, the Court finds that none of the comparators was similarly situated to Plaintiff, and that evidence of their disciplinary charges or sanctions is not relevant to Plaintiff's discrimination claims. The Court

member within the School of Business (such as [Plaintiff]) was mine and mine alone.") (*quoted in* Docket No. 95 at ¶ 97).

[22] The Court notes that even if K.H. were similarly situated to Plaintiff, "evidence of differential treatment of 'a single member of the non-protected class is insufficient to give rise to an inference of discrimination.'" *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999), quoting *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998).

concludes that Plaintiff has failed to make out a *prima facie* case of discrimination under Title VII, the ADEA, the ADA or the RA, and that Defendant is entitled to summary judgment as to Counts VI, VIII, IX, XI and XIII.

**E. Retaliation Under Title VII (Count XII)**

> To state a prima facie claim for retaliation under Title VII, . . . a plaintiff must demonstrate that (1) he engaged in activity protected by the statute, (2) the employer took an adverse action against him either after or contemporaneously with the protected activity, and (3) there was a causal connection between the protected activity and the adverse action.
> . . . .
> The causal connection must be but-for causation.

*Nelatury v. Pennsylvania State University*, 2025 WL 216320, *11 (W.D. Pa. 2025).

Plaintiff alleges that he "engaged in protected activity when he appealed the initial adverse decision and alleged that the decision was discriminatory including based on his race, color, and national origin." (Docket No. 26 at ¶ 242). Defendant concedes that Plaintiff complained of national origin discrimination in his appeal. (Docket No. 99 at 38).[23] The parties disagree as to whether Plaintiff also complained of race and sex discrimination. *Compare* Docket No. 100 at ¶ 155 (Plaintiff's "appeal did not include a claim of sex or race discrimination by the University."), *with* Docket No. 111 at ¶ 155 ("He further complained of both sex and race discrimination."). The Court need not resolve that disagreement, as Plaintiff's complaint of national origin discrimination suffices to satisfy the first *prima facie* element. *See* 42 U.S.C. § 2000e–3(a) (prohibiting discrimination against an employee "because he has opposed any practice made an unlawful employment practice"); *Crawford v. Metropolitan Government of Nashville and Davidson County*,

[23] Defendant also acknowledges that Plaintiff complained of age and disability discrimination in his appeal, but points out, correctly, that "Title VII does not reach age or disability claims." (Docket No. 99 at 38). *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.").

*Tenn.*, 555 U.S. 271 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication" virtually always "constitutes the employee's *opposition* to the activity.") (ellipsis and italics in original).

With respect to the second element, although the only adverse action taken against Plaintiff either after or contemporaneously with his discrimination complaint was the denial of his appeal, the Court concludes that this action is sufficiently adverse to satisfy that element. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) (adopting expansive definition of "materially adverse action" for purposes of Title VII's anti-retaliation provisions).

However, with respect to the third element – a "causal connection between the protected activity and the adverse action" – the Court finds Plaintiff's showing insufficient.[24] Third Circuit "case law has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson v. William Patterson C. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). Plaintiff has not proffered any evidence of ongoing antagonism during the appeal period; nor has he pointed to any aspect of the appeal's timeline that suggests a link between the outcome and Plaintiff's complaints of discrimination. *Cf. Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015) ("To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'") (quoting *Farrell*, 206 F.3d at 284).[25]

---

[24] The Court notes that denial of Plaintiff's appeal should not too readily be attributed to his complaints of discrimination in light of Plaintiff's well-founded contention that the appeal process was superficial and perfunctory, and did not provide for reassessment of facts. (Docket No. 113 at 20). In other words, by the time Plaintiff's case reached the appeal stage, the "writing was on the wall." *Cf. Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014) ("An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity.").

[25] The Court recognizes that the factors of timing and antagonism are not exclusive. As the *Farrell* court observed, "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has

Indeed, Plaintiff has offered no meaningful argument in support of his retaliation claim. In his brief in opposition to Defendant's motion for summary judgment, Plaintiff does not address any possible causal link between his discrimination complaints and denial of his appeal, but instead suggests that "some or all" of the charges against him (which he characterizes as harassment of him) "can be seen as retaliation for protected speech", because after he "exercised his protected right to respond" to charges raised by Defendant's investigator, "he was retaliated against by the University when it lodged extensive additional evidence against him". (Docket No. 113 at 39). However, Plaintiff does not indicate (or support with evidence) that his "protected speech" during and following the investigative interview included complaints of discrimination or was otherwise "protected" under Title VII. On the contrary, Plaintiff conceded in his deposition that "when [he] filed the appeal to the sanctions in this case", it was "the first time [he] raised allegations of discrimination at the University of Pittsburgh". (Docket No. 111 at ¶ 174). Because all of the "retaliation" referred to in Plaintiff's brief predated the appeal, it could not have been caused by his Title VII protected activity; hence it cannot support a claim for retaliation under Title VII.[26]

The Court concludes that Plaintiff has not proffered evidence of any circumstances that would support an inference of a causal link between his complaints of discrimination and denial

---

allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference." *Farrell*, 206 F.3d at 280-81. In the present case, however, Plaintiff has not adduced any such other types of evidence.

[26] Plaintiff's failure to address the element of a causal link between his discrimination complaints and rejection of his appeal is perhaps not surprising considering his testimony that he did not believe there was any such link:

> Q. Am I understanding your complaint correctly that you believe you were retaliated against by the University of Pittsburgh because your appeal was denied after having raised those allegations of discrimination?
>
> A. No, I don't think there was any retaliation after the -- after the appeal as such.
>
> Q. When do you believe there was retaliation?
>
> A. Just in the sanctions kind of that came down and the allegations that were made in the first place.

(Docket No. 111 at ¶ 174).

of his appeal. Accordingly, Plaintiff has not made out a *prima facie* case of retaliation, and Defendant is entitled to summary judgment as to Count XII.

**F. Breach of Contract Under Pennsylvania Common Law (Count VII)**

Unlike Counts I through VI and Counts VIII through XIII (all of which assert claims arising under and governed by federal law), Count VII asserts claims for breach of contract "in Violation of Pennsylvania Common Law". (Docket No. 26 at 22). Before addressing state law claims on the merits, the Court must satisfy itself that it possesses subject matter jurisdiction over them. *See Arbaugh v. Y & H Corp*., 546 U.S. 500, 514 (2006) ("courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"). Here, Plaintiff alleges[27] that jurisdiction is founded upon 28 U.S.C. § 1367, which provides that

> [I]n any civil action of which the district courts have original jurisdiction,[28] the district court shall have supplemental jurisdiction over all of the claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Section 1367(a) codified the judicially-created recognition of "pendent" federal jurisdiction over state-law claims sufficiently related to claims within the court's original jurisdiction, as exemplified in *United Mineworkers v. Gibbs*, 383 U.S. 715 (1966).[29] In elaborating on when federal and state claims form part of the same case, the Supreme Court held that:

> Pendent jurisdiction, in the sense of judicial power, exists whenever there is a claim "arising under [t]he Constitution [or] the Laws of the United States" . . . , and the relationship between that claim and the state claim permits the conclusion that the

[27] (Docket No. 26 at ¶ 3).

[28] The Court has original jurisdiction over Counts I through VI and VIII through XIII pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[29] See H.R. REP. NO. 101-734, at 29 n.15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6375 n.15 (§ 1367(a) "codifies the scope of supplemental jurisdiction first articulated by the Supreme Court in . . . *Gibbs*").

> entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

*Gibbs*, 383 U.S. at 725 (footnotes and citations omitted).[30] As the Court recognized in *Gibbs*, "the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation." *Id.* at 727.

A careful review of Count VII of the First Amended Complaint discloses that it actually asserts two distinct contract claims. Plaintiff's principal claim concerns procedural protections allegedly derived from Defendant's formal policies. (Docket No. 26 at ¶¶ 177-95, 199-201). Plaintiff contends in general that Defendant's "bylaws, policies, and procedures form a binding contract between the University and [Plaintiff]", and in particular that "CS-20, the Bylaws [(§ 4.8)], and the Faculty Reviews and Appeals Procedure [("FRAP")] collectively guarantee faculty members facing termination-level sanctions a live hearing with core procedural protections, including cross-examination." (Docket No. 113 at 28).[31] This claim closely parallels the due process claim in Count I, addressed in a prior Memorandum Opinion of this Court. (Docket No. 134). In effect, Count I and the procedural claim in Count VII seek the same remedy (damages)

[30] *See also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (characterizing and summarizing *Gibbs* as "establishing a new yardstick for deciding whether a federal court has jurisdiction over a state law claim brought in a case that also involves a federal question[:] . . . [A] federal court has jurisdiction over an entire action, including state law claims, whenever the federal law claims and state law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'").

[31] In his First Amended Complaint, Plaintiff also claimed breach of contractual rights under Defendant's CS_11 and CS_27 policies. (Docket No. 26 at ¶¶ 177-195, 199-201). Defendant argues that CS_20 does not apply because Plaintiff's conduct was not sufficiently severe, and that CS_11 was not breached because Plaintiff was not punished for violation thereof. (Docket Nos. 95 at ¶ 44; 99 at 42; 100 at ¶ 2-3, 159). In any event, Plaintiff appears to have abandoned the CS_11 and CS_27 claims in his briefing.

for the same injury (deprivation of asserted procedural rights), predicated on the same course of events and (to a large extent) the same policies. The Court concludes that these claims derive from a common nucleus of operative fact and would ordinarily be expected to be tried in one proceeding. *See Gibbs*, 383 U.S. at 722 ("state law claims are appropriate for federal court determination if they form a separate but parallel ground for relief also sought in a substantial claim based on federal law") (citing *Hurn v. Oursler*, 289 U.S. 238 (1933).[32]

Turning to the merits of this claim, it is unnecessary for the Court to determine whether and to what extent Defendant's policies may be deemed incorporated into contracts between Defendant and its faculty members, because the Court finds that the provisions relied upon by Plaintiff are either inapplicable to his situation by their express terms or have been applied by Defendant, whether or not they are binding.

First, Plaintiff's reliance on § 4.8 of the Bylaws is misplaced, as that section applies only to termination of tenure-track faculty members. (Docket No. 95 at ¶ 13). Second, this Court previously agreed with Defendant that the FRAP is "'an appeal process only for decisions related to nonrenewal of faculty employment contracts, denial of tenure, and denial of promotion', and is inapplicable to Plaintiff's suspension." (Docket No. 134 at 3 n.6). And third, the record shows that Defendant has substantially complied with its CS_20 policy, with one exception noted by the parties. Since Plaintiff has failed to establish a breach by Defendant of any applicable procedural policy, Defendant is entitled to partial summary judgment as to Count VII insofar as it asserts a claim for deprivation of procedural rights derived from Defendant's policies.

[32] *See also, e.g., Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1359 (9th Cir. 1988) (pendent claims remain within the court's jurisdiction if the vital facts that must be proved as predicates of the [federal] claims are the same as those that must be proved to establish . . . the pendent claims"). *Cf. Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir. 1995) (where "[t]he remedy sought based on the state claims is the same remedy sought based on the federal claims – damages for the same set of injuries to the plaintiffs [–] . . . . the difficulty of avoiding duplicative recoveries is a factor tending to weigh against litigating related federal and state claims in different fora").

Count VII also includes a secondary claim for unpaid compensation. (Docket No. 26 at ¶¶ 196-98). Although CS_20 provides that "[s]anctions will not be imposed until . . . a determination is made regarding any . . . appeal", Defendant initially commenced Plaintiff's suspension without pay on or about November 7, 2023 (prior to commencement of Plaintiff's appeal). (Docket Nos. 26 at ¶¶ 196-97; 100 at ¶¶ 168-69; 112 at ¶¶ 79-80). After learning of its mistake, Defendant paid Plaintiff's salary through the end of the appeal before re-commencing his suspension on February 29, 2024. (Docket Nos. 111 at ¶ 169, 114 at ¶ 130). However, Plaintiff contends that he has not been made whole, as "he still lost approximately $9,000 because the University cut off his 401k starting November 8, 2023 and did not provide him with University matching as well as another $1,000 related to his chair compensation that was not fully reimbursed." (Docket No. 112 at ¶ 81). Defendant has denied this contention (Docket No. 123 at ¶ 81), but at oral argument Defendant's counsel stated that "if those amounts were to be proved, I have no doubt that the University would pay them. There's no doubt that suspension without pay in the first instance was incorrect and the University's intention was to quickly correct it." (Docket No. 132 at 42).

An employee's entitlement to compensation, including both salary and benefits, is a matter of contract, and arises under state law. But unlike his procedural contract claim, Plaintiff's compensation claim seeks damages that are distinct from those sought in his federal claims, and are based upon a distinct set of facts. The circumstances that led to Defendant's erroneous withholding of payment are immaterial to Plaintiff's right to be paid in accordance with his contract; and the withheld payment is at best peripherally relevant to Plaintiff's due process and discrimination claims. The Court therefore finds that the compensation claim does not arise out of a common nucleus of operative fact to Plaintiff's federal claims and would not ordinarily be expected to be tried in the same proceeding with them. And accordingly, the Court concludes that

it lacks subject matter jurisdiction under § 1367 over the portion of Count VII that asserts a claim for unpaid compensation, and that such claim must be dismissed, without prejudice.[33]

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted with respect to Count II through VI and VIII through XIII, and with respect to the procedural claim in ¶¶ 177-95 and 199-201 of Count VII; and the compensation claim in ¶¶ 196-98 of Count VII will be dismissed without prejudice for lack of subject-matter jurisdiction. An appropriate Order follows.

Dated: September 22, 2026

*/s/ Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

cc/ecf: counsel of record

[33] The Court notes that pursuant to 28 U.S.C. § 1367, the statute of limitations on Plaintiff's compensation claim will be tolled until 30 days after dismissal.